AB:RMP
F.# 2020R00278

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USERNAME STEPHON.CLARK.560 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | APPLICATION FOR A SEARCH WARRANT FOR INFORMATION IN POSSESSION OF A PROVIDER (FACEBOOK ACCOUNT)<br><br>Case No. 20-MJ-247 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, JOSE CHEVERE, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. I am a Task Force Officer with the New York City Police Department ("NYPD") and Bureau of Alcohol, Tobacco and Firearms ("ATF") Joint Robbery Task Force. I have been

an officer of the NYPD for seventeen years and I have been part of the NYPD/ATF Joint Robbery Task Force for two years. Throughout my career in law enforcement, and especially since becoming a Task Force Officer, I have participated in many investigations that involved electronic evidence.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, I submit that there is probable cause to believe that violations of 18 U.S.C. §§ 924(c) and 1951(a) have been committed by STEPHON DAVON CLARK and other unknown persons. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5. In cooperation with other law enforcement officers in the NYPD 75th Precinct Detective Squad and the Joint Robbery Task Force, I have been investigating a pattern of robberies that have occurred within the 75th Precinct in Brooklyn over the last several months, from January to March, 2020. In some of these robberies, the perpetrator or perpetrators entered commercial establishments, sometimes brandishing a gun, and demanded money; in some of the robberies, the perpetrator or perpetrators stole electric bicycles and other items from restaurant delivery workers.

6. I have reviewed reports of victim statements to the NYPD and surveillance camera videos of all of the robberies in the suspected pattern. All of the videos depict the

2

perpetrator or perpetrators' clothing, size, and build, and some of the videos depict the perpetrator or perpetrators' face, hands, and weapon. Based on those videos and the statements of victims, it appears that the same perpetrator is responsible for some or all of the solo robberies that were identified as a pattern and was a participant in certain robberies with one or more unknown participants.

7. In one of the robberies, which was committed on January 27, 2020 on Shepherd Avenue in Brooklyn and recorded on surveillance video that I have reviewed, the perpetrator stole an electric bicycle from a restaurant delivery worker. The next day, the perpetrator pawned that bicycle at a pawn shop on Atlantic Avenue in Brooklyn, which was also recorded on surveillance video that I have reviewed. The perpetrator presented photo ID to the pawn ship that identified him as STEPHON DAVON CLARK, and he signed his own name to pawn the bicycle. The victim's photo ID was recovered from the bicycle's basket at the pawn shop.

8. Video of another of the robberies, which was committed on February 13, 2020 at a convenience store on Jamaica Avenue in Brooklyn, was shown on Brooklyn News 12. An anonymous caller to the NYPD CrimeStoppers hotline identified one of the perpetrators in the video as STEPHON CLARK and provided CLARK's Facebook username, stephon.clark.560, and his cellphone number. I have reviewed the public Facebook posts, including photographs and videos, on this Facebook account (the "Target Account"), and the images of STEPHON CLARK match the STEPHON DAVON CLARK who was recorded on the pawn shop surveillance video and the surveillance videos that depict the robberies. Additionally, some of the public photographs and videos on the Target Account show CLARK wearing articles of clothing that he wore in some of the robberies.

9. On March 4, 2020, based in part on some of the above facts, and some additional information, the Honorable Steven M. Gold, United States Magistrate Judge for the Eastern District of New York, issued a search warrant for historical cell-site information associated with the phone number for CLARK that was received from the anonymous tip. See Case No. 20-MC-509. The data returned from that warrant revealed (among other things) that the phone was within less than half a mile of the location of the January 27 robbery within approximately ten minutes of that robbery, which further corroborates the veracity of the anonymous tip.

10. Some of photographs and videos on the Target Account show CLARK with a woman, whom I believe to be his wife or girlfriend, whose own Facebook account is publicly linked to CLARK's. In some of the public photographs and videos on that account and on the Target Account, the woman I believe to be CLARK's wife or girlfriend appears to be wearing different wigs, one of which matches the appearance of a wig that CLARK wore during a robbery on March 8, 2020, at a gas station on Atlantic Avenue in Brooklyn, which was recorded on surveillance videos that I have reviewed.

11. On March 12, 2020, based in part on some of the above facts, and some additional information, the Honorable Peggy Kuo, United States Magistrate Judge for the Eastern District of New York, issued a warrant for the arrest STEPHON DAVON CLARK, see Case No. 20-MJ-245, and a search warrant for a residence where STEPHON DAVON CLARK is believed to reside with the woman believed to be his wife or girlfriend, see Case No. 20-MJ-246.

12. Based on the above facts, I submit that there is probable cause to believe that a search of non-public information on CLARK's Facebook account will reveal additional evidence

of the crimes described herein and described more fully in the application for a warrant authorizing the arrest of CLARK.

## FACEBOOK

13. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

14. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

15. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

16. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

17. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

18. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a

user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

19. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

20. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

21. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

22. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

23. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

24. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

25. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

26. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

27. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

28. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings;

rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

29. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

30. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

31. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

32. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

33. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

34. Based on the forgoing, I request that the Court issue the proposed search warrant.

35. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has

jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____
JOSE CHEVERE
Task Force Officer
NYPD/ATF Joint Robbery Task Force

Sworn to before me this
__13__ day of March, 2020

_____  s/Bloom
THE HONORABL
UNITED STATES
EASTERN DISTR

12